UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

| | |
|---|---|
| J.P. MORGAN SECURITIES LLC, ) | |
| ) | CIVIL ACTION NO.  4:23-CV-114-RGJ |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| JAMES A. PHELPS, JR., ) | |
| 7311 Parkridge Drive ) | |
| Newburgh, IN 47630 ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT**
**(INJUNCTIVE RELIEF SOUGHT)**

Plaintiff J.P. Morgan Securities LLC ("JPMorgan" or "Plaintiff"), files this Complaint and Application for Temporary Restraining Order and Injunctive Relief against defendant James A. Phelps, Jr. ("Defendant").

**Preliminary Statement**

1. This action is for a temporary restraining order and a preliminary injunction to maintain the status quo pending resolution of an arbitration proceeding between JPMorgan and Defendant that concurrently is being filed with FINRA Dispute Resolution.[1]

2. This dispute arises out of Defendant's resignation from JPMorgan on October 4, 2023, and the immediate commencement of his affiliation with Wells Fargo Advisors Financial Network, LLC ("Wells Fargo").  At the time of his resignation, Defendant worked as a Private

---

[1] The Financial Industry Regulatory Authority ("FINRA") was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange.  JPMorgan has the express right to seek temporary injunctive relief before a court of competent jurisdiction pending the outcome of arbitration before a full panel of duly-appointed arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes.  A true and correct copy of Rule 13804 is annexed to the accompanying Declaration of Leonard Weintraub.

Client Advisor in a bank branch office of JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), an affiliate of JPMorgan, in Owensboro, Kentucky.

3. JPMorgan has learned that since resigning from JPMorgan and joining his new firm, Defendant has solicited more than a dozen JPMorgan clients to move their accounts from JPMorgan to him at Wells Fargo. JPMorgan has learned that Defendant is calling and emailing JPMorgan clients, including calls to clients on their personal cell phones and emails to their personal email addresses, seeking to induce such clients to transfer their accounts from JPMorgan to him at Wells Fargo. The clients have informed JPMorgan that Defendant's communications have been more than simply announcing his change of employment, and that he is actively seeking to induce them to do business with him or requesting meetings and appointments with the clients.

4. At least four JPMorgan clients formerly serviced by Defendant received a package from Defendant and Wells Fargo (the "Solicitation Packet"), which was delivered to the clients via FedEx (or regular mail) at their homes. The clients informed JPMorgan that they did not request the Solicitation Packet and did not authorize Defendant and Wells Fargo to send them the Solicitation Packet. The Solicitation Packet includes five documents:

(i) A "wedding style" announcement that Defendant joined Wells Fargo;

(ii) A cover memorandum stating the Solicitation Packet was being "made available to individuals considering a relationship with Wells Fargo Advisors Financial Network";

(iii) A four-page Wells Fargo document titled "Form CRS: Relationship Summary" that states: "***Form CRS provides information to help you make an informed decision about whether or not to invest with us, and how. This document can help you learn about our firm and prepare you for a potential dialogue with a financial advisor or other financial professional.***" (emphasis added);

  (iv) A Wells Fargo document titled "Regulation Best Interest Disclosure" that states: "***This disclosure summarizes important information concerning the scope and terms of the brokerage services we offer and details the material facts relating to conflicts of interest that arise through our delivery of brokerage services to you***. Our goal is to provide you with the information you need to make informed investment decisions. ***We encourage you to review this information carefully*** . . . ***You should contact us promptly*** either in writing or by phone if you do not fully understand this or any other disclosure we provide you, including any questions you have ***concerning the essential facts of your brokerage relationship with us***, or our conflicts of interest. (emphasis added); and

  (v) A FINRA disclosure form, titled "Issues to consider when your broker changes firms."

A true and accurate copy of the Solicitation Packet is annexed to the Declaration of Dallas G. Polk ("Polk Declaration") as <u>Exhibit A</u>.

 5. Although the cover memorandum included in the Solicitation Packet states that it is "made available to individuals considering a relationship with Wells Fargo Advisors," none of the clients indicated that they were considering any relationship with Wells Fargo and none of the clients had asked for such materials to be sent to them by Defendant or Wells Fargo. Indeed, most of the clients informed JPMorgan that they were *not* considering a relationship with Wells Fargo and had not requested materials from Defendant or Wells Fargo.

 6. At least three other clients informed JPMorgan that they received an email from Defendant that they did not ask for, which included hyperlinks to two of documents included in the Solicitation Packet: the Wells Fargo document titled "Form CRS: Relationship Summary" and the Wells Fargo document titled "Regulation Best Interest Disclosure." One client forwarded to JPMorgan a copy of the email that Defendant sent to them on October 4, 2023 – the same day that he resigned. A true and accurate copy of such email is annexed to the Declaration of Dallas G. Polk ("Polk Declaration") as <u>Exhibit B</u> (with the client's name and email address redacted).

7. Defendant' October 4, 2023 email to the client states:

> As I shared over the phone, there are some disclosures that I need to share with you in order to help you make an informed choice. Included in this email are links to three important disclosures you should read.
>
> 1. **Form CRS: Relationship Summary**: This four-page disclosure provides information to help you make an informed decision about whether or not to invest with us, and how. We encourage you to read this document before choosing to invest.
>
> 2. **Regulation Best Interest Disclosure**: This disclosure is specific to our brokerage services and contains important information concerning the scope and terms of the brokerage services we offer, and the conflicts of interest that arise when we provide brokerage services to you. While lengthy, this document offers information to help you thoroughly evaluate our brokerage services. RBI-DD-04012021
>
> 3. **FINRA Educational Communication**: This two-page educational communication piece includes considerations in deciding whether to transfer your assets to Wells Fargo Advisors Financial Network. (See Exhibit B.)

8. The clients who received this email informed JPMorgan that they were ***not*** considering a relationship with Wells Fargo and had not requested materials from Defendant or Wells Fargo.

9. In addition, on information and belief, Defendant took with him to his new firm JPMorgan's confidential client information, including client contact information, such as cell phone numbers and email addresses, which, on information and belief, are generally not publicly available, without which he would have been unable to immediately commence calling/emailing and soliciting JPMorgan clients beginning immediately after he resigned from JPMorgan.

10. Unfortunately, it appears that Defendant's improper solicitation efforts have proved successful, as approximately 8 JPMorgan households, with assets totaling approximately $3.6 million, already have transferred their accounts to Defendant at Wells Fargo

11. At the time he left JPMorgan, Defendant serviced approximately 330 JPMorgan clients/households with approximately $109 million in total assets under management, the vast majority of which were either pre-existing JPMorgan clients at the time they were assigned to Defendant, or were developed by Defendant while working for JPMorgan.

12. Defendant's conduct constitutes a breach of his employment agreement (which contains non-solicitation and confidentiality provisions), and a violation of his common-law obligations to JPMorgan.

13. To prevent continued irreparable harm arising from Defendant's course of misconduct, JPMorgan seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring Defendant from soliciting JPMorgan's clients, and barring him from further using JPMorgan's confidential and proprietary business and client information, pending resolution of JPMorgan's claims against him in a related arbitration that JPMorgan is in the process of commencing.

## Jurisdiction and Venue

14. The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that JPMorgan, on the one hand, and Defendant, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events giving rise to the claims occurred in Owensboro, Kentucky.

## The Parties

16. JPMorgan is a Delaware limited liability company and a national broker-dealer, with its principal place of business in New York City, New York.  The sole member of

JPMorgan Securities is J.P. Morgan Broker-Dealer Holdings Inc., which is a Delaware corporation with its principal place of business in New York, New York.  JPMorgan is a member firm of the Financial Industry Regulatory Authority ("FINRA").

17. JPMorgan provides traditional banking, investment, and trust and estates services in the Louisville area through its Chase Wealth Management branch offices.  Unlike traditional brokerage firms (where clients are serviced almost exclusively by one financial advisor), JPMorgan's Chase Wealth Management adopts a team approach to service a wide variety of JPMorgan clients' investment and banking needs.

18. Defendant is an individual who at all times relevant herein was employed and/or conducted business in Kentucky and was and is a citizen of Indiana.  Defendant worked for JPMorgan in an office in Owensboro, Kentucky, and is currently a registered representative associated with Wells Fargo in an office in Owensboro, Kentucky.

19. In connection with his status as a registered representative of JPMorgan, Defendant executed a Form U-4 Uniform Applications for Securities Industry Registration or Transfer.  By executing the Form U-4, Defendant agreed to submit to arbitration before FINRA disputes, claims and controversies arising between himself and JPMorgan.

**Factual Allegations**

20. Defendant was employed by JPMorgan or its affiliates since October 2008 until his resignation on October 4, 2023.  In or about October 2008, Defendant commenced employment with JPMorgan Chase as a relationship banker, and maintained his securities licenses through Chase Investment Services Corp. ("Chase Investment"), then a registered broker-dealer, and an affiliate of JPMorgan.  At the commencement of his employment, Defendant entered into a Chase Investment Services Corp. Supervision, Arbitration, Confidentiality and Non-

6

Solicitation Agreement (the "Non-Solicitation Agreement") with Chase Investment. The Non-Solicitation Agreement contains provisions prohibiting Defendant from soliciting JPMorgan's clients for a one period after the termination of his employment and requiring him to maintain the confidentiality of JPMorgan's confidential and proprietary business and client information. A true and accurate copy of the Non-Solicitation Agreement is annexed to the Polk Declaration as Exhibit C. Effective October 1, 2012, Chase Investment merged with and into JPMorgan, with JPMorgan being the surviving legal entity.

21.     In September 2015, Defendant switched from the banking side of the business to the brokerage side, becoming a Financial Advisor Associate Trainee in one of JPMorgan Chase's bank branches in Owensboro.

22.     In June 2016, Defendant was promoted to the position of Private Client Advisor for Chase Wealth Management, and worked out of a JPMorgan Chase bank branch office located at 2938 Frederica Street in Owensboro, Kentucky from December 2015 through his resignation.

23.     As a Private Client Advisor, JPMorgan Chase referred its bank clients to Defendant in order for him to build JPMorgan's relationship with such clients. Defendant sat at his desk at the JPMorgan Chase bank branch and was introduced to hundreds of existing bank clients (with or without investment accounts) to offer and provide access to investment opportunities through Chase Wealth Management. As a Private Client Advisor, Defendant was not expected to engage in cold calling or attempt to build a client base independent of referrals from JPMorgan. The vast majority of the clients Defendant serviced at JPMorgan were assigned to him by JPMorgan or were referred to him by JPMorgan Chase.

24.     Defendant had no prior banking or brokerage experience before joining JPMorgan.

25. In consideration for entering into and continuing his employment relationship with JPMorgan and executing the Non-Solicitation Agreement, Defendant was provided with significant benefits, including substantial compensation, office and support facilities, securities registration, research, and health insurance.

### Defendant's Obligations to JPMorgan

26. As noted above, Defendant entered into an agreement with JPMorgan or its predecessors that, among other things, contains provisions prohibiting him from soliciting JPMorgan clients for a period of one year after his JPMorgan employment ends and from using or retaining JPMorgan confidential information.

27. Section 7(a) of the Non-Solicitation Agreement, entitled "Confidential Information," provides, in relevant part, that:

> *You understand that, by entering into this Agreement, by virtue of your position with JPMC and by the nature of JPMC's business, you have had access to, currently have access to, will have access to and will consistently and routinely be given trade secrets and confidential information related to JPMC's business. Confidential information concerning JPMC's business includes information about JPMC, as well as described further in the Code of Conduct and subparagraphs (b) and (c) below (the "Confidential Information"). You also understand that you will be provided with specialized training and mentoring that is unique and proprietary, which draws upon, relies upon and is part of the Confidential Information described herein.*

28. Section 7(b) of the Non-Solicitation Agreement provides, in relevant part, that, in addition to any description in the Code of Conduct, Confidential Information includes, but is not limited to:

> *i. names, addresses and telephone numbers of clients and prospects;*
>
> *ii. account information, financial standing, investment holdings and other personal financial data compiled by and/or provided to or by JPMC;*
>
> *iii. specific customer financial needs and requirements with respect to investments, financial position and standing; leads, referrals and*

> *references to clients and/or prospects, financial portfolio, financial account information, investment preferences and similar information, whether developed, provided, compiled, used or acquired by JPMC and/or myself in connection with your employment at JPMC;*
>
> \* \* \*
>
> *vi. all records and documents concerning the business and affairs of JPMC (including copies and originals and any graphic formats or electronic media);*
>
> \* \* \*
>
> *viii. information concerning established business relationships;*
>
> *ix. "trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of "Confidential Information" specifically described in this Section.*

29. In Section 7(c) of the Non-Solicitation Agreement, Defendant again expressly acknowledges that JPMorgan's customer account information contains confidential financial information, names, addresses, customers' net worth, investment objectives and similar information which is confidential, not readily known by competitors, and must be safeguarded.

30. In Sections 7(d) and 7(e) of the Non-Solicitation Agreement, Defendant agreed to maintain the confidentiality of JPMorgan's Confidential Information, not to disclose such Confidential Information to or use for the benefit of any third party, and to return all JPMorgan Confidential Information upon the termination of his employment.

31. In Section 8 of the Non-Solicitation Agreement, Defendant agreed not to solicit JPMorgan's clients for a period of twelve months after the termination of his employment:

> a. You understand and acknowledge that JPMC considers its client and customer relationships . . . important and valuable assets. Accordingly, in consideration of and as a condition of your employment, continued employment, access to trade secrets and Confidential Information, specialized training and mentoring, and other consideration provided herein, **you understand and agree for a period of twelve (12) months after your employment with JPMC terminates for any reason that you may not on your own behalf or that of any other persons or entities, directly or indirectly solicit or**

9

> *attempt to solicit, induce to leave or divert or attempt to induce to leave, or divert from doing business with JPMC, any then current clients . . . or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with JPMC, or otherwise interfere with the relationship between JPMC and such clients . . . or other persons or entities.*

32. In Section 10(a) of the Non-Solicitation Agreement, Defendant agreed that the above-referenced provisions are reasonable, and that he voluntarily entered into the agreement after having had an opportunity to review it with counsel:

> i. *You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under Sections 7, 8, and 9 of this Agreement, and have had the opportunity to retain legal counsel at your own expense to review this Agreement. You acknowledge that these restrictions are reasonable in time and geographic scope, are fully required to protect the legitimate interests of JPMC and its clients and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.*
>
> ii. *You acknowledge that the terms and conditions of Sections 7, 8 and 9 of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.*
>
> iii. *You acknowledge that you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving sales-related compensation for the sale of non-deposit investment products, and that you are signing it knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions. You further acknowledge the reasonableness and enforceability of the terms of this Agreement, and you will not challenge the enforceability or terms of this Agreement.*

33. In addition, in Section 10(b) of the Non-Solicitation Agreement, Defendant acknowledges that any breach of the provisions set forth above will cause irreparable harm to JPMorgan entitling it to seek immediate injunctive relief and to recover its attorneys' fees in

connection with instituting any legal proceeding and/or arbitration to enforce the Non-Solicitation Agreement.

### JPMorgan's Relationship with its Clients and its Confidential Information

34. As indicated above, JPMorgan gave Defendant the vast majority of the clients he was servicing at the time of his resignation. The substantial majority of clients assigned to Defendant were pre-existing JPMorgan clients who were reassigned to Defendant, were long-term Chase Bank clients who were referred to Defendant, or were developed by JPMorgan at the time they were assigned to Defendant.

35. JPMorgan has invested substantial time and money, totaling millions of dollars, to acquire, develop and maintain its clients over many years. It is with great difficulty, and only after a great expenditure of time, money and effort, that JPMorgan was able to acquire its existing clients. JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information. It typically takes many years of dealing with clients for JPMorgan to become their primary investing firm. JPMorgan clients typically remain with and continue to be serviced by the firm, regardless of whether the Private Client Advisor or other team members resign or leave JPMorgan. But for Defendant's employment with JPMorgan, Defendant would not have had any contact with the substantial majority of the clients the firm assigned to him and whom he is now soliciting.

36. As part of his official duties at JPMorgan, Defendant had access to extensive confidential financial records and information about JPMorgan's clients, including information about each client's investment and trust and estates needs. As explained in further detail below, such information – which is not publicly available, and cannot be easily duplicated – is proprietary and valuable, and would be especially useful to a competitor.

37. During the course of his employment by JPMorgan, Defendant had access to highly confidential JPMorgan client files in addition to other financial information that is confidential and proprietary to JPMorgan. JPMorgan's client files contain confidential financial information regarding each client, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data. Defendant had no interaction with the substantial majority of the clients he was assigned at JPMorgan (and no knowledge of any of their confidential information) until he started working at JPMorgan. As indicated above, this information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

38. A critical factor to JPMorgan's continued success is its relations with its clients. JPMorgan has built the loyalty of its client base through many years of effort and has invested substantially in building JPMorgan's goodwill. JPMorgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its Chase Wealth Management employees, including Defendant, for them to use to obtain and build relationships with its clients.

39. JPMorgan's records maintained concerning its clients are not available from other sources and have been created and updated for a period of many years based on JPMorgan's relationship with its clients. JPMorgan has invested substantial corporate resources to develop and maintain its client information. The substantial majority of the JPMorgan clients that Defendant serviced were developed by JPMorgan at great expense and over a number of years. JPMorgan's client list is the lifeblood of its business and the expenditures incurred by JPMorgan in obtaining its clients include the millions of dollars spent by JPMorgan every year on national

and local advertising and marketing, the millions of dollars it costs to train JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its goodwill in the industry.

40. JPMorgan also has expended significant resources to service its clients, the substantial majority of whom were assigned to Defendant or referred to him by JPMorgan Chase. These resources include millions of dollars a year JPMorgan spends for support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services. JPMorgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendant.

41. JPMorgan employs reasonable efforts to maintain the confidentiality of its client records. Specifically, access to the records is restricted to those employees whose jobs require them to refer to this information, duplication of the records is prohibited and there are constant reminders about the confidential nature of the information contained on the records. Employees such as Defendant must maintain client information as strictly confidential. These instructions are confirmed in the agreements and policy manual provisions referenced above.

42. The confidential information that Defendant, on information and belief, has taken or retained was entrusted to JPMorgan by its clients with the expectation that it would remain confidential and would not be disclosed to third parties. Indeed, by law JPMorgan must safeguard this information until such time as the controlling authorities authorize its release. Defendant had access to this information solely by virtue of his employment by JPMorgan. JPMorgan and Defendant are obliged to maintain the confidentiality of this information. For its

part, JPMorgan took numerous steps to protect the confidentiality of this information. Defendant was fully aware of, and responsible for, complying with JPMorgan's internal policies regarding confidentiality. JPMorgan has implemented numerous other policies, and has established tight security, to ensure the confidentiality of its client information. For example, access to JPMorgan's computer network by its professionals is password-protected. JPMorgan also limits its client information to certain employees and management who need access to such information.

### **Defendant's Misconduct**

43. As noted above and incorporated herein, based on information known at this time, Defendant resigned from JPMorgan on October 4, 2023, immediately joined his new firm and began soliciting JPMorgan clients.

44. As set forth above, more than ten JPMorgan clients have informed JPMorgan that Defendant has solicited their business and asked for meetings or appointments with the clients, as detailed above.

45. Defendant's solicitation of JPMorgan clients is ongoing and continuing.

46. On information and belief, without misappropriating JPMorgan's confidential client information, Defendant would not have had clients' personal phone numbers or email addresses, and would not have had the ability to call JPMorgan clients immediately after he resigned.

47. Defendant's misconduct, as described above, constitutes at a minimum, breach of contract, breach of fiduciary duty and duty of loyalty, misappropriation of trade secrets, tortious interference, conversion, and unfair competition. Unless Defendant's conduct is immediately enjoined, JPMorgan's other employees will be encouraged to engage in the same improper

conduct. This misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients and employees.

48. By seeking to improperly solicit JPMorgan's clients, Defendant has and will continue to cause continuing and irreparable injury to JPMorgan which cannot be cured by monetary damages. Defendant's wrongdoing has caused and will continue to inflict irreparable harm to JPMorgan by causing:

    (a)    Loss of JPMorgan clients and loss of client confidence;

    (b)    Injury to JPMorgan's reputation and goodwill in the Owensboro market;

    (c)    Use and disclosure of JPMorgan's trade secrets and confidential and proprietary information, including client lists;

    (d)    Damage to office morale and stability, and the undermining of office protocols and procedures; and

    (e)    Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

### **FIRST CAUSE OF ACTION**
### **(Breach of Contract)**

49. JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 48 hereof.

50. Defendant breached his contract and agreement with JPMorgan by soliciting JPMorgan's clients and by, on information and belief, taking JPMorgan's confidential client information. By engaging in such conduct, Defendant seeks to convert to his benefit JPMorgan's protectable interests.

51. As a direct and proximate result of Defendant's breach of his contract, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot

now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SECOND CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

52. JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 51 hereof.

53. JPMorgan's confidential and proprietary business and client information derives substantial, independent economic value from not being generally known to the public or to JPMorgan's competitors, who could obtain economic value from the information. JPMorgan expended substantial financial and human resources to develop this information, which cannot be easily acquired or replicated by others, from among the literally millions of actual or potential individual investors in the marketplace. Further, JPMorgan has taken substantial efforts to maintain the secrecy of its confidential and proprietary business and customer information, including but not limited to restricting access to such information, designating such information as confidential, and requiring confidentiality agreements. Accordingly, JPMorgan's confidential and proprietary business and customer information constitutes trade secrets pursuant to statutory and common law.

54. As a direct and proximate result of Defendant's misappropriation of JPMorgan's trade secrets, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

55. JPMorgan realleges and reincorporates herein by reference the allegations contained in paragraphs 1 through 54 hereof.

56. As an employee of JPMorgan, Defendant owed JPMorgan a fiduciary duty of trust and loyalty.

57. Defendant's fiduciary duty required him at all times to, among other things, act in JPMorgan's best interests and not act on behalf of competing third parties, and maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and client information.  Defendant's fiduciary duty required him at all times to refrain from, among other things, planning to and then soliciting JPMorgan's clients to join him at a competing company.

58. Defendant breached his fiduciary duty to JPMorgan by engaging in the conduct alleged above.  Defendant engaged in such wrongdoing upon planning his resignation from JPMorgan and joining JPMorgan's competitor and immediately soliciting JPMorgan's clients.

59. As a direct and proximate result of Defendant's breaches of his fiduciary duty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## FOURTH CAUSE OF ACTION
### (Breach of Duty of Loyalty)

60. JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 59 hereof.

61. By virtue of his position with JPMorgan, Defendant owed JPMorgan a duty of undivided loyalty during the term of his employment with JPMorgan. Defendant's duty of loyalty prohibited him from competing with JPMorgan or assisting a competing business during the course of his employment with JPMorgan. Defendant's duty of loyalty also included a duty to act toward JPMorgan fairly, honestly and in good faith, to maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and client information, and to refrain from any act or omission calculated or likely to injure JPMorgan.

62. Defendant breached his duty of loyalty to JPMorgan by engaging in the conduct alleged above (and incorporated herein) prior to the termination of his employment with JPMorgan.

63. Defendant knew and intended, or knew and recklessly or negligently disregarded, that his acts had the purpose and/or effect of disrupting and harming JPMorgan's business.

64. As a direct and proximate result of Defendant's breach of his duty of loyalty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## FIFTH CAUSE OF ACTION
### (Conversion)

65. JPMorgan realleges and incorporates herein by reference, the allegations of paragraphs 1 through 64 hereof.

66. At all times JPMorgan was, and still is, entitled to the immediate and exclusive possession of its trade secrets and other proprietary information, and all physical embodiments thereof, as alleged above.

67. JPMorgan is informed and believes that Defendant took or retained JPMorgan's trade secret and other proprietary information, including but not limited confidential client contact information, and converted such information for the use of Defendant and those acting in concert with him.

68. The continued detention of JPMorgan's personal property by Defendant constitutes conversion.

69. As a direct and proximate result of Defendant's conversion, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## EIGHTH CAUSE OF ACTION
### (Unfair Competition)

70. JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 69 hereof.

71. Defendant's conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

72. As a direct and proximate result of Defendant's unfair competition, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**WHEREFORE**, Plaintiff respectfully requests that a judgment be entered in its favor against Defendant as follows:

A. In support of all claims for relief, a temporary and preliminary injunction lasting until such time as a duly appointed panel of arbitrators at FINRA renders an award on

JPMorgan's claim for permanent injunctive relief, enjoining and restraining Defendant, directly or indirectly, and whether alone or in concert with others, from:

(a) soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any JPMorgan client serviced by Defendant at JPMorgan or whose name became known to Defendant by virtue of his employment with JPMorgan (or any of its predecessors in interest); and

(b) using, disclosing or transmitting for any purpose JPMorgan's documents, materials and/or confidential and proprietary information pertaining to JPMorgan, JPMorgan's employees, and/or JPMorgan's clients.

B. Ordering Defendant, and all those acting in concert with him, to return to JPMorgan or its counsel all records, documents and/or information in whatever form (whether original, copied, computerized, electronically stored or handwritten) pertaining to JPMorgan's clients, employees and business, within 24 hours of notice to Defendant or his counsel of the terms of such an order.

C. Such other and further relief as the Court deems just and proper.

Dated: October 20, 2023

                                      Respectfully submitted,

                                      TACHAU MEEK PLC

                                      /s/ Dustin E. Meek
                                      Dustin E. Meek
                                      101 South Fifth Street, Suite 3600
                                      Louisville, Kentucky 40202
                                      Phone: (502) 238-9902
                                      Facsimile: (502) 238-9910
                                      dmeek@tachaulaw.com
                                      *Counsel for J.P. Morgan Securities LLC*